FILED

09/05/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0290

DA 15-0290

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 217

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DARYL E. STRANG,

      Defendant and Appellant.

APPEAL FROM:      District Court of the Fourth Judicial District,
In and For the County of Mineral, Cause No. DC 14-11
Honorable Ed P. McLean, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

             Chad M. Wright, Chief Appellate Defender, Chad R. Vanisko, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

             Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

             Marcia Boris, Mineral County Attorney, Superior, Montana

Submitted on Briefs:   July 26, 2017

Decided:   September 5, 2017

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     The State charged Daryl Strang with Abuse or Exploitation of an Older Person for allegedly exploiting 83-year-old Ben Poat financially and for failing to care for him. Before the case went to trial, Poat was appointed a guardian and a conservator. The conservator secured rulings in a separate case divesting Strang of assets Poat had conveyed to him. The jury found Strang guilty of the charges. The District Court denied Strang's request for a new trial and sentenced him to prison. Strang appeals the court's admission of certain evidence at trial and its refusal to order a new trial for juror misconduct. He argues for the first time on appeal that the presiding judge should have been disqualified because the judge entered orders against Strang's interests in the guardianship and conservatorship case. We affirm.

¶2     We restate the issues as follows:

1. *Whether Strang is entitled to a hearing on his request to disqualify the trial judge;*

2. *Whether the District Court abused its discretion when it allowed the State to present certain documents and witness testimony that the prosecutor disclosed shortly before trial;*

3. *Whether the District Court abused its discretion when it determined that juror misconduct did not warrant a new trial.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶3     Strang met Ben Poat in 2007. Poat was in his late seventies, was unmarried, had no children, and lived alone. Strang began helping Poat with odd jobs around Poat's house, and over time he began assisting Poat with his finances. Poat gave Strang a durable power of attorney in 2012 and a specific power of attorney over Poat's bank

2

account in 2013. Poat also made Strang the primary beneficiary of his will and transferred property to Strang, including vehicles and real property. Approximately thirty-five checks were issued to Strang from Poat's bank account, totaling over $142,000.

¶4    In September 2013, Rena Ayers—a social worker with the Adult Protective Services Division of the Department of Public Health and Human Services—met with Poat at his home in response to a complaint from Poat's sister. Ayers noted, among other things, that Poat had untreated melanomas, that he had trouble remembering facts such as his own birthdate and his siblings' names, and that the only food in the house was peanut butter and milk. Due in part to Ayers's concerns about Poat's inability to care for himself and his susceptibility to exploitation, Adult Protective Services initiated guardianship and conservatorship proceedings in September 2013. Poat subsequently was diagnosed with dementia.

¶5    The guardianship and conservatorship proceedings took place in the Fourth Judicial District Court, with Judge John Larson presiding.[1] Although the case register for those proceedings lists only Judge Larson as the presiding judge, Judge Ed McLean also participated in the case. Judge McLean issued an order in November 2013 that invalidated Poat's 2012 will naming Strang as the beneficiary, invalidated Poat's power

---

[1]  Strang and the State have asked that this Court take judicial notice of certain documents contained in the record of Poat's guardianship and conservatorship proceedings. The parties have attached these documents—which include orders and minute entries—to their briefs on appeal. These documents constitute records of a court of this state, of which we take judicial notice. M. R. Evid. 202(b)(6), (d)(2); *Draggin' Y Cattle Co. v. Addink*, 2016 MT 98, ¶ 14, 383 Mont. 243, 371 P.3d 970 (hereafter, *Draggin' Y II*).

3

of attorney to Strang, and required the return of certain property that had been transferred from Poat to Strang.

¶6     The State charged Strang in May 2014 with Abuse or Exploitation of an Older Person, in violation of § 52-3-825, MCA.  The State contended that Strang took financial advantage of Poat and that he failed to take reasonable steps to maintain Poat's health. Judge McLean presided over the case.  The State's Affidavit and Motion for Leave to File Information stated that Judge McLean had appointed a guardian and a conservator for Poat and that the court had issued an order invalidating Poat's will and power of attorney to Strang and ordering the return of some of Poat's property from Strang.  Strang did not object to Judge McLean presiding over the criminal case or request his disqualification.

¶7     A jury trial began on January 12, 2015.  Poat died in August 2014, before the start of trial.  Ten days before trial, on January 2, the State disclosed two new potential witnesses, Michelle Parkin and Lori Dove.  The witnesses were employees of First American Title Company, and they were present when Strang inquired at that company about executing a quitclaim deed to transfer some of Poat's property to him.  The witnesses allegedly heard Strang claim falsely that Poat had "no living relatives."

¶8     On January 9, 2015, three days before trial, the State received documents from Wells Fargo in response to a December 2014 subpoena relating to Poat's bank account. The documents included copies of canceled checks made out to Strang.  The State transmitted these records to the defense within hours after it received them.

4

¶9    Strang filed a motion in limine and request for sanctions in which he asked the court to exclude Parkin and Dove from testifying and to prohibit the State from using the newly-produced bank records. The court denied the motion and allowed the State to introduce the bank records and to call Parkin as a witness.[2] The court reasoned that the State had fulfilled its duty to promptly disclose all evidence and witnesses to the defense as soon as it was able. At the close of trial, the jury found Strang guilty of purposely or knowingly abusing or neglecting Poat and of exploitation of an older person.

¶10   Strang moved for a new trial. He argued that the court wrongfully allowed the State to call Parkin as a witness and to introduce the Wells Fargo bank records. He asserted further that he was deprived of a fair trial due to juror misconduct. He alleged that one juror was present with her husband in a restaurant when the husband made a statement suggesting that he believed Strang to be guilty. Strang alleged further that another juror improperly commented on Strang's guilt to the Bailiff during trial and that the Bailiff expressed his agreement with the juror.

¶11   The District Court denied Strang's motion for a new trial. It reasoned that the State had acted reasonably with regard to its late disclosures of witnesses and evidence and that Strang had failed to demonstrate prejudice from either the late disclosures or the alleged juror misconduct. The court sentenced Strang to a total of twenty years in prison with ten years suspended.

¶12   Strang appeals.

---

[2] The State decided not to call Dove, and the court did not rule on whether she could testify. We thus address only the District Court's decision regarding Parkin.

5

## STANDARDS OF REVIEW

¶13 We review judicial disqualification questions de novo. *Draggin' Y Cattle Co. v. Junkermier*, 2017 MT 125, ¶ 10, 387 Mont. 430, 395 P.3d 497 (hereafter, *Draggin' Y III*). Our inquiry requires an objective examination of the circumstances surrounding potential judicial disqualification and an accurate interpretation of the Montana Code of Judicial Conduct. *Draggin' Y III*, ¶ 10.

¶14 A district court has broad discretion in determining whether evidence is relevant and admissible. *State v. Lozon*, 2012 MT 303, ¶ 9, 367 Mont. 424, 291 P.3d 1135. We will not disturb a district court's determination on the admissibility of evidence absent an abuse of discretion. *Lozon*, ¶ 9. Abuse of discretion occurs if a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Lozon*, ¶ 9.

¶15 This Court reviews motions for new trial based on juror misconduct for abuse of discretion. A district court will not be overturned unless a defendant demonstrates that he was deprived of a fair and impartial trial. *State v. MacGregor*, 2013 MT 297, ¶ 15, 372 Mont. 142, 311 P.3d 428.

## DISCUSSION

¶16 *1. Whether Strang is entitled to a hearing on his request to disqualify the trial judge.*

¶17 Strang argues for the first time on appeal that Judge McLean should have recused himself from this case because he ruled on matters in Poat's guardianship and conservatorship proceedings. Strang claims that the same issues were dispositive of

Strang's guilt in the criminal case. He asserts that Judge McLean "had personal knowledge of the facts in dispute, had expressed bias against [Strang], and presided as a judge in Poat's guardianship proceedings which involved a matter that went to the heart of the State's case against [Strang]." He argues that his disqualification claim is not untimely because it is based on Judge McLean's bias or prejudice and because Strang was unaware of Judge McLean's involvement in the prior proceedings until after Strang's criminal proceedings concluded. Strang urges this Court to remand for a disqualification hearing.

¶18 We generally do not address issues raised for the first time on appeal. *Draggin' Y III*, ¶ 15. We may consider such issues, however, if they "affect[ ] the substantial rights of a litigant" or if "extenuating circumstances justify the party's failure to assert [its] legal theory at trial." *Draggin' Y II*, ¶ 15 (citations and internal quotations omitted). "A claim for disqualification of a judge must be brought within a reasonable time after the moving party learns the facts forming the basis for a claim that the judge should be disqualified." *State v. Dunsmore*, 2015 MT 108, ¶ 20, 378 Mont. 514, 347 P.3d 1220. If it is not brought within a reasonable time, the claim is waived. *Draggin' Y II*, ¶ 19.

¶19 The State's Affidavit and Motion for Leave to File Information, which it filed in May 2014, stated, "The Honorable Ed P. McLean, Montana Fourth Judicial District Judge, appointed a guardian and a conservator for [Poat] on October 21, 2013." It stated further, "The Court entered an order invalidating [Poat's 2012] will, ordering the return of [Poat's] personal property, invalidating the power of attorney granted to STRANG,

7

and invalidating the quitclaim deed providing STRANG an interest in [Poat's] real property on November 8, 2013."

¶20 The explicit reference to Judge McLean's involvement in the guardianship and conservatorship proceedings put Strang on notice that the Judge in his criminal case had presided in a civil case touching on Strang's relationship with Poat. Strang did not bring any concern to Judge McLean, but waited until after his final conviction to raise his disqualification claim. He did not bring his claim "within a reasonable time" after learning of "the facts forming the basis for a claim that the judge should be disqualified." *Dunsmore*, ¶ 20. In *Draggin' Y*, the complaining party did not learn of the judge's potential conflict until after the judge had made key rulings in the case. We determined that this presented "extenuating circumstances" warranting remand for a hearing under § 3-1-805, MCA, which provides the ordinary method for seeking a judge's disqualification. *Draggin' Y II*, ¶¶ 16, 31. Here, in contrast, the initiating documents in the State's case against Strang put in the record Judge McLean's participation in the related civil action, and Strang could have raised his concerns with the judge or invoked the procedure prescribed by § 3-1-805, MCA. There were no "extenuating circumstances" justifying Strang's failure to assert a disqualification claim. *Draggin' Y II*, ¶ 15. He did not make his claim timely, and we conclude that he waived it. *See Draggin' Y II*, ¶ 19.

¶21 Strang asserts, however, that the timeliness requirement does not apply to his disqualification claim because the claim is based on Judge McLean's actual bias or prejudice. The Code of Judicial Conduct "does not allow parties to waive

8

disqualification for bias or prejudice, and thus the timeliness requirement does not apply when a disqualification claim is based on bias or prejudice." *Dunsmore*, ¶ 18 (citing M. C. Jud. Cond., Rule 2.12(C)).

¶22 A fair trial—which is "a basic requirement of due process"—requires "that any judge who is biased or partial with regard to a particular matter or party be disqualified from hearing the case." *Draggin' Y II*, ¶ 15 (citations and internal quotations omitted). The Montana Code of Judicial Conduct provides, "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." M. C. Jud. Cond., Rule 2.12(A); *Reichert v. State*, 2012 MT 111, ¶ 50, 365 Mont. 92, 278 P.3d 455. This includes situations in which the "judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding." M. C. Jud. Cond., Rule 2.12(A)(1). It includes also situations in which the judge "previously presided as a judge over the matter in another court." M. C. Jud. Cond., Rule 2.12(A)(5)(d).

¶23 In *Draggin' Y,* the District Court Judge presided over a stipulated settlement agreement that two parties entered into without the authorization or participation of one party's insurer. *Draggin' Y III*, ¶ 6. The insurer subsequently intervened and challenged the settlement's reasonableness, and the judge determined that the settlement was reasonable. *Draggin' Y III*, ¶ 6. At the same time that he was presiding over the case, the judge entered into a similar stipulated settlement agreement in a personal matter without his insurer's participation or authorization. *Draggin' Y III*, ¶ 22. The Office of the Court Administrator, which acted as the judge's "insurer" in his personal case, contested the

9

reasonableness of the stipulated settlement. *Draggin' Y III*, ¶ 22. The judge did not disclose to the parties the existence of his own stipulated settlement or the fact that the insurer in his case had contested the settlement's reasonableness. *Draggin' Y III*, ¶ 23. We held that the judge "continued to have a present and immediate interest in his own personal stipulated settlement" while presiding over the case. *Draggin' Y III*, ¶ 25. We determined that the judge's "impartiality in deciding the stipulated settlement's reasonableness might reasonably be questioned" and therefore that he should have been disqualified. *Draggin' Y III*, ¶ 26 (internal quotations omitted).

¶24 *Draggin' Y* was a case in which the judge had "a present and immediate interest in his own *personal* [litigation]" that involved issues substantially similar to those over which the judge was then presiding. *Draggin' Y III*, ¶ 26 (emphasis added). Strang has not shown how this case bears any similarity. He does not establish that Judge McLean had any *personal* bias or prejudice against him. The question as to the judge's impartiality in *Draggin' Y* stemmed from his involvement in a personal dispute that bore a strong resemblance to the dispute over which he was presiding. *Draggin' Y III*, ¶ 22. By contrast, Strang's disqualification claim arose only from Judge McLean's rulings in a related court proceeding and not from any of Judge McLean's personal statements or actions outside of his judicial role.

¶25 Strang points only to Judge McLean's adverse rulings against him to support his allegation of Judge McLean's bias or prejudice. Yet a judge's previous adverse rulings against a party do not constitute sufficient evidence to demonstrate a judge's personal bias or prejudice against that party. *See In re Marriage of Gahr*, 212 Mont. 481, 486,

10

689 P.2d 257, 260 (1984) (holding that defendant failed to meet his burden of demonstrating a presumption of bias based on the judge's denial of several of defendant's motions); *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."); *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 1710 (1966) ("The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case."); *see also* § 3-1-805(1)(b), MCA (stating that an affidavit alleging a judge's personal bias or prejudice "will be deemed not to have been made in good faith if it is based solely on rulings in the case which can be addressed in an appeal from the final judgment"). Judge McLean's adverse rulings against Strang's interests in the guardianship and conservatorship proceedings do not establish personal bias or prejudice against Strang. Because Strang's disqualification claim was not "a claim of actual bias or prejudice," the timeliness requirement applies. *Dunsmore*, ¶ 19.

¶26 Moreover, the knowledge that Judge McLean obtained in Poat's guardianship and conservatorship proceedings does not constitute "personal knowledge of facts that are in dispute" in Strang's criminal case sufficient to warrant disqualification under M. C. Jud. Cond., Rule 2.12(A)(1). "Montana's Code of Judicial Conduct is based on the ABA Model Code of Judicial Conduct." *Draggin' Y II*, ¶ 26. Under the Model Code of Judicial Conduct,

11

> Knowledge about matters in a proceeding that has been obtained by a judge within the proceeding itself *or within another legal proceeding* is permissible and does not call for disqualification. Therefore, presiding over a civil case does not disqualify the judge from presiding over the criminal case even if it is the same matter.

Charles Gardner Geyh et al., Judicial Conduct and Ethics § 4.10, 4-42 (5th ed. 2013) (emphasis added) (citing *Lee v. State*, 735 N.E.2d 1169 (Ind. 2000), and *Santisteban v. State*, 72 So.3d 187 (Fla. Dist. Ct. App. 2011)). "To be disqualifying, the knowledge must be obtained extrajudicially rather than in the judge's official capacity during the course of a proceeding." Arthur H. Garwin et al., Annotated Model Code of Judicial Conduct 308 (3d ed. 2016) (citing *Los v. Los*, 595 A.2d 381 (Del. 1991), *Poorman v. Commonwealth*, 782 S.W.2d 603 (Ky. 1989), and *In re T.L.S.*, 481 A.2d 1037 (Vt. 1984)). Strang is incorrect in asserting that Judge McLean should have been disqualified under M. C. Jud. Cond., Rule 2.12(A)(1).

¶27 Strang's argument that Judge McLean should have been disqualified on the ground that he "previously presided as a judge over the matter in another court" similarly is not correct. M. C. Jud. Cond., Rule 2.12(A)(5)(d). This provision of the Code is intended to bar a judge from hearing a case on appeal when the judge presided over that same case in a different court. *See* Arthur H. Garwin et al., Annotated Model Code of Judicial Conduct 332 (3d ed. 2016) ("Trial judges sometimes sit by designation on courts of appeal, and vice versa. Such judges should not hear cases over which they presided in a different court, and this Rule makes that clear."). This provision does not prevent a judge from presiding over a case simply because the judge previously presided over a related case. *See In re Aubuchon*, 309 P.3d 886, 890 (Ariz. 2013) (holding that, in a

disciplinary proceeding in which the presiding judge had previously participated in cases related to, but distinct from, the disciplinary proceeding, the judge had not "previously presided as a judge over the matter in another court").

¶28 Here, Strang's criminal case constitutes "the matter" at hand. M. C. Jud. Cond., Rule 2.12(A)(5)(d). Judge McLean did not preside over Strang's criminal case "in another court." M. C. Jud. Cond., Rule 2.12(A)(5)(d). Rule 2.12(A)(5)(d) therefore does not apply. Strang cites to *Bullman v. State,* 2014 MT 78, 374 Mont. 323, 321 P.3d 121, in support of his assertion that Rule 2.12(A)(5)(d) required Judge McLean's recusal. Our holding in *Bullman* relied on Rule 2.12(A)(5)(a), which requires disqualification when a judge "served *as a lawyer* in the matter in controversy." *Bullman*, ¶¶ 14-17 (emphasis added) (citation and internal quotations omitted). Judge McLean did not serve "as a lawyer in the matter in controversy." M. C. Jud. Cond., Rule 2.12(A)(5)(a). *Bullman* does not apply.

¶29 Judges frequently hear cases involving parties against whom they have ruled in previous cases. If judges had to recuse themselves from every such case, they could not, as a practical matter, fulfill their duty to "be available to decide matters that come before the courts." M. C. Jud. Cond., Rule 2.7 cmt. [1]. Judge McLean's involvement in both the guardianship and conservatorship proceedings and Strang's criminal case constituted a routine execution of his professional duties as a judge. As such, it did not cause Judge McLean's impartiality to "reasonably be questioned." M. C. Jud. Cond., Rule 2.12(A).

¶30 Because Strang's disqualification claim was untimely, because he did not establish a valid claim of personal bias or prejudice, and because he has not raised a colorable

13

claim that Judge McLean's impartiality might "reasonably be questioned," we conclude that his request for a disqualification hearing lacks merit. M. C. Jud. Cond., Rule 2.12(A).

¶31 *2. Whether the District Court abused its discretion when it allowed the State to present certain documents and witness testimony that the prosecutor disclosed shortly before trial.*

¶32 Strang contends that the State "ambushed" him by disclosing Parkin as a witness ten days before trial and by producing the Wells Fargo bank records just three days before trial. He argues that the State gave him almost no time to prepare proper rebuttals to these late disclosures. Strang asserts that the State knew or should have known about the content of Parkin's testimony and about the bank records well in advance of trial. He urges us to hold that the District Court's admission of Parkin's testimony and the bank records at trial was error that warrants a new trial.

¶33 Montana law requires the prosecution, upon request, to make available to the defendant certain "material and information within the prosecutor's possession or control," including documents it plans to introduce and information about witnesses it plans to call at trial. Section 46-15-322(1), MCA. If, after its initial disclosure, the State "discovers additional information or material that would be subject to disclosure had it been known at the time of disclosure," it must "promptly notify" the defendant "of the existence of the additional information or material and make an appropriate disclosure." Section 46-15-327, MCA. The purpose of these statutes is to "prevent surprise" at trial. *State v. Stewart*, 2000 MT 379, ¶ 22, 303 Mont. 507, 16 P.3d 391.

14

¶34 A district court may, within its discretion, impose sanctions for discovery violations. *State v. Pierce*, 2016 MT 308, ¶ 20, 385 Mont. 439, 384 P.3d 1042; § 46-15-329, MCA. "Such discretion allows the court to consider the reason why disclosure was not made, whether noncompliance was willful, the amount of prejudice to the opposing party, and any other relevant circumstances." *Pierce*, ¶ 20 (citing *State v. Golder*, 2000 MT 239, ¶ 11, 301 Mont. 368, 9 P.3d 635). "Absent a clear abuse of discretion, the decision of the district court must be upheld." *Golder*, ¶ 11. A district court does not abuse its discretion in declining to impose discovery sanctions when the State's failure to disclose evidence "was not willful and no prejudice resulted." *Golder*, ¶ 11; *accord State v. Van Voast*, 247 Mont. 194, 202, 805 P.2d 1380, 1385 (1991) (upholding the District Court's decision to allow late disclosure of a witness because the reason for the late disclosure was the State's "lack of knowledge of which [the witness] would be testifying," there was "no indication of willful noncompliance with the discovery statutes," and the defendant knew the identity of the witness twenty-four days before trial).

### A. The State's Disclosure of Parkin.

¶35 Long before the State disclosed its intent to call Parkin as a witness, Parkin approached the prosecutor's office and asked to make an appointment. She told a receptionist that Strang had inquired with her company about obtaining a quitclaim deed to transfer Poat's property to him. The receptionist informed Parkin that the prosecutor already had evidence of the property transfer to which Parkin referred. Parkin did not mention that she had overheard Strang state falsely that Poat had "no living relatives."

15

Parkin left without meeting with the prosecutor. The State first learned of Parkin's knowledge of Strang's statement on January 2, 2015, when, during a conversation at the courthouse between Parkin's coworker, Dove, and the prosecutor's assistant, Dove informed the assistant about the statement. At that point the prosecutor promptly notified Strang that the State intended to call Parkin and Dove as witnesses. Strang did not contact Parkin in the ensuing ten days before trial.

¶36 The District Court reasonably determined, given the evidence, that the State—through no fault of its own—was unaware until January 2, 2015, that Parkin knew about Strang's comment that Poat had "no living relatives." Prior to that date, the State did not possess "knowledge of [facts to] which [Parkin] would be testifying." *Van Voast*, 247 Mont. at 202, 805 P.2d at 1385. Once the State became aware of Parkin's knowledge of Strang's statement, it "promptly" notified the defense and made "an appropriate disclosure." Section 46-15-327, MCA. Although Parkin approached the prosecutor's office well before trial, she did not alert that office to her knowledge of Strang's comment. The District Court reasonably concluded from this that the State's late disclosure of Parkin "was not willful." *Golder*, ¶ 11. As the court noted, Strang had ten days between Parkin's disclosure and the time of trial to interview her and seek possible rebuttal witnesses. He did neither. The District Court properly considered "the reason why disclosure was not made, whether noncompliance was willful, the amount of prejudice to the opposing party, and any other relevant circumstances." *Pierce*, ¶ 20. Strang cannot show a "clear abuse of discretion"; therefore, the court's decision not to exclude Parkin or to grant a new trial "must be upheld." *Golder*, ¶ 11.

## B. The State's Disclosure of Poat's Bank Records.

¶37    The State's Information alleged that Strang exploited Poat "between August 1, 2012 and September 27, 2013" in order to obtain his "money, assets, or property."  The Affidavit and Motion for Leave to File Information stated that "between July 10, 2013 and September 19, 2014, STRANG wrote at least six checks to himself totaling $13,800" and that Strang "wrote a significant number of other checks on [Poat's] account."  During the initial discovery, the State provided Strang with all of Poat's bank records that it had received during the guardianship and conservatorship proceedings.  These records included six checks made out to Strang from Poat's account.  The prosecutor had received the records from the conservator and informed the court during discussions on Strang's motion in limine that she believed at the time that this set of documents constituted a complete record of Poat's bank account during the period of Strang's alleged financial exploitation.  The State learned later that it had not gotten all of the bank records, and it subpoenaed Wells Fargo to obtain the remainder.  The additional Wells Fargo records that the State received and transmitted to the defense on January 9 included dozens of additional checks made out to Strang.

¶38    After Strang filed his motion in limine, the court questioned him about his prior knowledge of the bank records that the State disclosed on January 9.  Strang informed the court that the bank had issued online statements for Poat's account and that Strang had been the recipient of those statements.  The court determined that Strang had been aware of the existence of the canceled checks well before January 9 and that the prosecution had complied with its duty to promptly disclose all the evidence in its possession or control.

17

¶39 The record supports the District Court's conclusion that Strang was aware of other checks and had access to the bank records in question well before the State disclosed them three days before trial. The checks were made out to Strang. Strang did not present evidence to counter the District Court's conclusion that he had access to Poat's bank statements during the time that the checks in question were issued. The bank statements that the State provided Strang during initial discovery—even though they included copies of only six checks—encompassed the same time period in which the dozens of additional checks were issued to Strang from Poat's account. The State's production of six checks from Poat's account during initial discovery put Strang on notice that it intended to introduce checks that were issued to Strang from Poat's account.

¶40 The State initially provided Strang with all of Poat's bank records that it had within its "possession or control." Section 46-15-322(1), MCA. The State did not withhold any bank records. Once it "discover[ed] additional information or material that would be subject to disclosure had it been known at the time of disclosure," it "promptly" notified Strang "of the existence of the additional information or material and ma[d]e an appropriate disclosure." Section 46-15-327, MCA. In *Pierce*, the State disclosed six days before trial a police officer's report that mistakenly had not been included in the County law enforcement department's investigative file. *Pierce*, ¶ 11. As soon as the State discovered the report, it provided a copy of it to the defense. *Pierce*, ¶ 21. Here, as in *Pierce*, the State's immediate disclosure of the bank records once it "became aware of them" did not violate the State's discovery obligations. *Pierce*, ¶ 21.

18

¶41 Further, Strang's defense was that his care helped Poat stay in his home and that Poat chose freely to make Strang the recipient of his property and the beneficiary of his will. Strang did not argue that he did not receive money from Poat's account. Instead, he argued that Poat gave money to Strang out of gratitude for Strang's assistance and that Strang did not deceive or manipulate Poat into giving him this money. The introduction of additional checks made out to Strang did not compel Strang to alter his defense at trial.

¶42 Strang has failed to show that any "prejudice resulted" from the State's late disclosure of the additional bank records. *Golder*, ¶ 11. Given that the late disclosure "was not willful and no prejudice resulted," we conclude that the District Court did not abuse its discretion in denying Strang's motion in limine or his motion for a new trial on the basis of the State's late disclosures. *Golder*, ¶ 11.

¶43 *3. Whether the District Court abused its discretion when it determined that juror misconduct did not warrant a new trial.*

¶44 Strang alleged in his motion for a new trial that he had been denied a fair trial due to juror misconduct. He claimed first that a juror and her husband were discussing the case at a restaurant near the courthouse, and that the husband was heard telling others that they were at "a trial for a guy who stole an old guy's money and property." Strang alleged that, in a separate incident, another juror was heard telling the Bailiff during the course of trial, "Next stop . . . the gallows"—an apparent reference to Strang. Strang claimed that the Bailiff expressed his agreement with the juror's statement. Strang relied

19

on eyewitness affidavits to support these claims of juror misconduct.[3]  He argued in his motion for a new trial that these incidents exposed the jurors to "extraneous information" concerning his guilt and that the jurors involved violated the court's directive to not discuss the case with others.

¶45    Strang argues on appeal that these jurors' acts of misconduct entitle him to a new trial.  Strang explains that the alleged juror misconduct, "[w]hile perhaps not sufficient in its own right to support a new trial," was sufficient to warrant a new trial "when combined with the other bases raised" in the motion.

¶46    A District Court may grant the defendant a new trial "if required in the interest of justice" and "if justified by law and the weight of the evidence."  Section 46-16-702, MCA.  A defendant may assert juror misconduct as a basis for a new trial.  *See, e.g., State v. Cooksey*, 2012 MT 226, ¶¶ 8-11, 366 Mont. 346, 286 P.3d 1174; *State v. Dunfee*, 2005 MT 147, ¶¶ 13-18, 327 Mont. 335, 114 P.3d 217; § 25-11-102(2), MCA (stating that, in the context of civil procedure, "misconduct of the jury" constitutes a ground for a new trial).  "Juror misconduct based on extraneous communications must be reviewed on a case-by-case basis, and in the context of the entire record.  The trial court is uniquely qualified to appraise whether extraneous information resulted in prejudice, and we accord substantial weight to that determination."  *MacGregor,* ¶ 19.  Although a juror's exposure to extraneous information creates a rebuttable presumption of prejudice, this

---

[3]  Strang also alleged in his motion that the juror's husband who commented on the trial at the restaurant was seen conversing with the judge and other jurors throughout the trial.  Strang presented no evidence in support of this allegation.

"presumption is not absolute, and arises only when the information shows a natural tendency to prejudice." *MacGregor*, ¶ 20.

¶47 As the District Court noted in denying Strang's motion for a new trial, the juror whose husband made the remarks in the restaurant was an alternate juror who did not participate in the jury's deliberations. She did not comment at the restaurant on the trial or respond to her husband's remarks. Even if the alternate juror was exposed to extraneous information, the District Court was "uniquely qualified to appraise whether [that] extraneous information resulted in prejudice." *MacGregor*, ¶ 19.

¶48 As to the other juror's alleged statement to the Bailiff, Strang presented no evidence that the Bailiff expressed his agreement with the comment. The witness affidavit describing the incident said nothing of the Bailiff's reaction. The Bailiff submitted an affidavit disavowing any knowledge of the juror's alleged comment. The court reasonably determined that the juror was not exposed to extraneous information and that the juror's lone comment did not have "a natural tendency to prejudice." *MacGregor*, ¶ 20. We therefore conclude that the District Court did not abuse its discretion in denying Strang's motion for a new trial as it pertained to the alleged juror misconduct. *See MacGregor*, ¶ 15.

**CONCLUSION**

¶49 Strang's disqualification claim was untimely, and he failed to establish a valid claim of bias or prejudice. The District Court did not abuse its discretion in its evidentiary rulings or in denying Strang's motion for a new trial. The judgment is affirmed.

21

/S/ BETH BAKER

We Concur:

/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ DIRK M. SANDEFUR
/S/ JIM RICE